UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ISLAND PARK, LLC,

                              Plaintiff,

       -against-                                              1:06-CV-310
                                                             (LEK/RFT)

CSX TRANSPORTATION, INC., CONSOLIDATED
RAIL CORPORATION, NATIONAL RAILROAD
PASSENGER SERVICE CORPORATION ("AMTRAK"),
THOMAS J. MADISON, JR., in his capacity as
Commissioner of the State of New York Department of
Transportation ("NYSDOT"), and DENNISON P.
COTTRELL, in his capacity as Director of the Passenger
and Freight Safety Division of NYSDOT,

                              Defendants.

_____

## MEMORANDUM-DECISION AND ORDER

        Plaintiff Island Park, LLC ("Island Park" or "Plaintiff") operates a nursery and cultivates

trees and plants on its property in Rensselaer County, New York.  Compl. (Dkt. No. 1) at ¶¶ 1, 17-

18.  Island Park's property is bisected by north-south railroad tracks that are part of the Hudson

Line, which runs between Albany and New York City, and are owned by Defendant CSX

Transportation, Inc. ("CSXT").  Id. at ¶¶ 5, 17-18; Defts' Joint Stat. of Mat. Facts (Dkt. No. 38,

Attach. 3) at ¶ 2.  Defendant Consolidated Rail Corporation ("Conrail") owned the Hudson Line

prior to CSXT's acquisition of Conrail's interest.  Compl. (Dkt. No. 1) at ¶ 4; Defts' Joint Stat. of

Mat. Facts (Dkt. No. 38, Attach. 3) at ¶ 4.  Defendant National Railroad Passenger Service

Corporation ("Amtrak") maintains portions of the Hudson Line.  Defts' Joint Stat. of Mat. Facts

(Dkt. No. 38, Attach. 3) at ¶ 5.  Island Park has an easement to use a railroad crossing known as

Abele's Crossing, which Plaintiff accesses through private unpaved roads on either sides of the tracks. Compl. (Dkt. No. 1) at ¶¶ 2, 19; Defts' Joint Stat. of Mat. Facts (Dkt. No. 38, Attach. 3) at ¶ 8.

On February 16, 2005, the New York Department of Transportation ("NYSDOT") commenced an administrative proceeding, pursuant to section 97 of the New York Railroad Law, to determine if Abele's Crossing "should be altered or closed and discontinued." Compl. (Dkt. No. 1) at ¶ 52; Defts' Joint Stat. of Mat. Facts (Dkt. No. 38, Attach. 3) at ¶ 14. After holding several public hearings, on February 27, 2006, Administrative Law Judge David S. Nealon recommended that Abele's Crossing be closed. Defts' Joint Stat. of Mat. Facts (Dkt. No. 38, Attach. 3) at ¶ 27, 29. Following Judge Nealon's recommendation, on March 8, 2006, Island Park received an order signed by Defendant Dennisson P. Cottrell, Director of NYSDOT's Passenger and Freight Safety Division, directing that CSXT implement the closure and discontinuance of Abele's Crossing by removing the crossing surface and installing barricades preventing the use of the crossing. Compl. (Dkt. No. 1) at ¶ 90; Defts' Joint Stat. of Mat. Facts (Dkt. No. 38, Attach. 3) at ¶ 30.

Shortly after receiving NYSDOT's order, Island Park commenced this action and moved for a preliminary injunction to stop the closure of Abele's Crossing. See Compl. (Dkt. No. 1); Order to Show Cause (Dkt. No. 4). Plaintiff also seeks a permanent injunction enjoining Defendants from enforcing or executing NYSDOT's closure order, and alleges that the order is preempted by federal law, deprives Plaintiff of its property interest without due process, and constitutes a taking without just compensation or due process in violation of the Fifth and Fourteenth Amendments to the United States Constitution, as well as the Constitution's Commerce Clause. See Compl. (Dkt. No. 1). This Court issued an Order to show cause and temporarily restrain Defendants from closing Abele's

2

Crossing pending the determination of the parties' motions.  See Order to Show Cause (Dkt. No. 4);

Stipulation (Dkt. No. 6).

Presently before the Court are: two Motions for summary judgment by Defendants CSXT,

Conrail, and Amtrak (collectively the "Railroad Defendants"); a Motion for summary judgment

filed by Defendant Cottrell and Defendant Thomas J. Madison, Jr. ("Madison" or "Commissioner"),

NYSDOT Commissioner (collectively, the "State Defendants"); and Island Park's Cross-Motion for

partial summary judgment with respect to the second and third causes of action contained in its

Complaint and a stay of the remaining claims pending a determination by the New York State

Supreme Court, Albany County.  See Dkt. Nos. 38, 39, 40, & 45.  For the following reasons,

Motions for summary judgment by Railroad Defendants and State Defendants are granted in part

and denied in part; Plaintiff's Motion is denied.  However, based on the submissions, the Court *sua*

*sponte* grants summary judgment to Plaintiff on its first cause of action, finds that closure of the

crossing by section 97 is preempted by federal law, and permanently enjoins Defendants from

closing Abele's Crossing pursuant to said statute.


I.      **Background**

Island Park's nursery consists of approximately 400 acres; it stores its tractors on the east

side of CSXT's tracks and uses Abele's Crossing to accesses the fields on the west side of the

tracks.  Plntf's Stat. of Mat. Facts (Dkt. No. 45, Attach. 12) at ¶ 9.  Plaintiff asserts that almost one-

quarter of its cultivated fields and crops are on the west side of the tracks.  Id. at ¶ 14.  Abele's

Crossing is accessible only from a private, unpaved road on Island Park's property, which makes it a

"private" crossing used by an individual and not the general public.  Id. at ¶ 5; Defts' Joint Stat. of

3

Mat. Facts (Dkt. No. 38, Attach. 3) at ¶ 9.  The Hudson Line consists of two sets of parallel railroad

tracks, which are raised and bordered by embankments at the Abele's Crossing site.  Plntf's

Response to Joint Stat. of Mat. Facts (Dkt. No. 45, Attach. 12) at ¶ 11; Defts' Joint Stat. of Mat.

Facts (Dkt. No. 38, Attach. 3) at ¶ 11.  The crossing consists of the unpaved roads that connect to

asphalt between the rails and the tracks; there is no automated warning system.  Plntf's Response to

Joint Stat. of Mat. Facts (Dkt. No. 45, Attach. 12) at ¶ 12; Defts' Joint Stat. of Mat. Facts (Dkt. No.

38, Attach. 3) at ¶ 12.

Members of the Abele family (the "Abeles") previously owned Island Park's nursery.

Plntf's Stat. of Mat. Facts (Dkt. No. 45, Attach. 12) at ¶ 22.  In August, 1981, the Abeles brought an

action in New York State Supreme Court, Rensselaer County seeking an order enjoining Conrail

from interfering with their right of way and use of the crossing.  Plntf's Stat. of Mat. Facts (Dkt. No.

45, Attach. 12) at ¶¶ 23-24.  The Abeles alleged that in 1978, Conrail, as part of its improvements of

the Hudson Line, raised the tracks but failed to restore the planks between the tracks that constituted

the crossing.  CSXT Stat. of Mat. Facts (Dkt. No. 38, Attach. 5) at ¶ 2.  In October, 1988, the Abeles

and Conrail entered into a stipulation that required Conrail to restore the crossing, pay the Abeles

$100,000, and "cease and desist from interfering with said crossing of the plaintiffs and their

predecessors and successors in interest from now until all time."  Id. at ¶ 25 (quoting stipulation).

On June 21, 1989, the New York State Supreme Court issued an order ("1989 Order") reiterating

the terms of the 1988 stipulation, and directed Conrail to "restore the railroad crossing and maintain

said crossing in the present and in the further at defendant's sole expense."  Id. at ¶¶ 26-27.

Pursuant to the 1989 Order, it is undisputed that CSXT and Conrail made certain improvements to

Abele's Crossing.  Id. at ¶ 28; Railroad Defts' Joint Resp. (Dkt. No. 53) at ¶ 28.  Thereafter,

4

Plaintiff asserts that the crossing has been used on a continuous basis, first by the Abeles and, after purchasing the property and crossing at issue in 1999, by Island Park.  Buono Aff. (Dkt. No. 45, Attach. 4) at ¶¶ 21-24.

Plaintiff asserts that in or about late 2004 and early 2005, NYSDOT invited Joseph Buono ("Buono"), Island Park's sole shareholder, to attend meetings at its office in Colonie, New York.  Id. at  ¶¶ 2, 25.  According to Plaintiff, NYSDOT representatives advised Buono that they intended to close Abele's Crossing and asked him to prepare a summary of costs Island Park would incur as a result.  Id. at ¶ 25.

NYSDOT commenced an administrative proceeding pursuant to section 97 of the New York Railroad Law, on February 16, 2005, to determine if Abele's Crossing should be closed.  Plntf's Stat. of Mat. Facts (Dkt. No. 45, Attach. 12) at ¶31.  On February 22, 2005, , NYSDOT's Office of Proceedings issued a notice scheduling a hearing before Judge Nealon.  Id. at ¶ 32.  Buono asserts that he again met with NYSDOT representatives on February 28, 2005; according to Buono, the representatives stated that the crossing should be closed, though there were no funds allocated to compensate Island Park for the closure, and that a bridge approximately ten (10) miles south of the crossing would be built in its place.  Buono Aff. (Dkt. No. 45, Attach. ) at ¶¶ 30-32.

Judge Nealon held a public hearing in connection with the NYSDOT proceeding over a four-day span between March 10 and May 6, 2005.  Defts' Joint Stat. of Mat. Facts (Dkt. No. 38, Attach. 3) at ¶ 15.  After considering testimony from multiple witnesses, on February 27, 2006, Judge Nealon issued a decision and recommendation that Abele's Crossing be closed.  Id. at ¶ 29.  To reach his decision, Judge Nealon considered a number of factors, including: the physical characteristics of the crossing and their effect on safety; the public's use of the tracks; Plaintiff's use

of the crossing; and alternatives to the crossing available to Plaintiff.  Id. at ¶ 17.  Judge Nealon

concluded that the significant rail traffic and poor sight distance caused by the curvature and

elevation of the tracks made it dangerous for some of Plaintiff's vehicles and equipment to cross the

tracks at Abele's Crossing.  Id. at ¶ 28 (citing Nealon Decision).  Moreover, Judge Nealon noted that

other points of access were safer and allowed Plaintiff access to its fields on the other side of the

tracks.  Id.  The following day, Defendant Cottrell signed the order implementing Judge Nealon's

recommendation and directing CSXT to close Abele's Crossing.  Id. at ¶ 30.  Plaintiff then

commenced this action seeking to enjoin the State and Railroad Defendants from enforcing the

closure order.  Compl. (Dkt. No. 1).  On June 27, 2006, Plaintiff commenced a special proceeding in

New York State Supreme Court, Albany County, alleging, *inter alia*, that the NYSDOT disregarded

its property interests in Abele's Crossing and failed to follow procedures set forth in New York's

eminent domain law.  State Defts' Stat. of Mat. Facts (Dkt. No. 40, Attach. ) at ¶ 3.


## II.     Discussion

### A.      Standard of Review

Rule 56 of the *Federal Rules of Civil Procedure* provides that summary judgment is proper

when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S.

317, 322 (1986).  Courts applying this standard must "resolve all ambiguities, and credit all factual

inferences that could rationally be drawn, in favor of the party opposing summary judgment."  Brown

v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (quoting Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d

6

Cir. 2001)).

Once the moving party meets its initial burden by demonstrating that no material fact exists for trial, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citations omitted). The nonmovant "must come forth with evidence sufficient to allow a reasonable jury to find in her favor." Brown, 257 F.3d at 251 (citation omitted). Bald assertions or conjecture unsupported by evidence are insufficient to overcome a motion for summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991); W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990).


**B.       Plaintiff's Constitutional Claims Against State Defendants**

Plaintiff contends that the State Defendants' order closing Abele's Crossing is a taking of its real property interest without due process in violation of the Fifth and Fourteenth Amendments. Plntf's Mem. of Law (Dkt. No. 45, Attach. 10) at 6. The State Defendants assert that the Eleventh Amendment bars suits seeking monetary damages or retroactive injunctive relief against a state without its consent or Congress's abrogation of its immunity. State Defts' Mem. of Law (Dkt. No. 40, Attach. 7) at 11-12. The State Defendants claim that Plaintiff's action is essentially one for money damages, a type of action for which New York State has not consented to suit in federal court. Id. Additionally, the State Defendants argue that for Plaintiff to assert successfully a takings claim it must show: (1) that a final decision regarding the property has been made, and (2) that Plaintiff was denied just compensation by means of an adequate state procedure; State Defendants argue that Plaintiff had not sought compensation through the state courts until after the commencement of this action, and, therefore, there has been no final determination of compensation

7

and Plaintiff has not exhausted its state remedies.  Id. at 13-14.  There are no disputed material facts.

### 1.   Due Process Claim

Plaintiff claims that the State Defendants' order directing the Railroad Defendants to barricade its easement across the tracks was a taking accomplished without regard to State laws governing condemnation and without due process of law.  Plntf's Mem. of Law (Dkt. No. 45, Attach. 10) at 6.  Plaintiff notes that section 97(5) of the New York Railroad Law directs NYSDOT's Commissioner to acquire easements, when deemed necessary in connection with proceedings under this section, in the same manner as property is acquired for state highway purposes.  Id. at 8.  Plaintiff explains that the New York Highway Law requires property to be acquired as provided in the eminent domain procedure law, which Plaintiff asserts requires notice, an opportunity to be heard, and compensation.  Id.  Instead of adhering to the eminent domain procedures, Plaintiff claims that Defendant Cottrell simply issued an administrative order directing CSXT to barricade the crossing; Plaintiff asserts that this alleged failure to comply with New York's eminent domain procedure represents an appropriation of private property without due process of law.  Id.

The Due Process Clause only protects against deprivations of constitutionally protected interests in property when such deprivations have occurred without due process of law.  See Rivera-Powell v. New York City Bd. of Elections, 470 F.3d 458, 464-65 (2d Cir. 2006).  Once it has been established that a plaintiff has been deprived of a protected life, liberty or property interest, in order "'to determine whether a constitutional violation has occurred, it is necessary to ask what process the State provided, and whether it was constitutionally adequate.'"  Id. at 465 (quoting Zinermon v. Burch, 494 U.S. 113, 126 (1990)).  State Defendants do not argue that Island Park did not have a

property interest in Abele's Crossing; instead, they argue: (1) that the Eleventh Amendment bars claims seeking monetary damages or retroactive injunctive relief; (2) that failure to follow section 97(5) constitutes a "random unauthorized act" for which there exists a post-deprivation remedy that satisfies constitutional due process requirements; and (3) that the hearing that was held adequately provided the required constitutional process.  See State Defts' Mem. of Law (Dkt. No. 40, Attach. ) at 11-12; State Defts' Resp. Mem. of Law (Dkt. No. 50, Attach. 10) at 4-5.

### i.      Sovereign Immunity Does Not Bar Plaintiff's Claims Against State Defendants

The Supreme Court has consistently held that under the Eleventh Amendment to the United States Constitution federal courts lack jurisdiction not only over suits against a state brought by citizens of other states, but also over suits against such states brought by their own citizens.  Hans v. Louisiana, 134 U.S. 1 (1890); Edelman v. Jordan, 451 U.S. 651, 662-63 (1974). However, a suit for damages against a state may be brought in federal court if the state has consented to suit or Congress has properly abrogated the states' Eleventh Amendment immunity.  Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54-57 (1996). This action comes before the Court, in part, pursuant to 42 U.S.C. § 1983, which does not constitute an exercise of congressional authority to abrogate any state's Eleventh Amendment immunity from suit for claims brought pursuant to said statute.  Quern v. Jordan, 440 U.S. 332, 340-342 (1979).  In addition, the State of New York has not consented to be sued in federal court pursuant to § 1983.  Dube v. State Univ. of New York, 900 F.2d 587, 594 (2d Cir. 1990)

New York State's immunity from suits commenced under § 1983 does extend to agents and instrumentalities that act effectively as arms of the state.  See Woods v. Rondout Valley Cent. Sch.

Dist. Bd. of Educ., 466 F.3d 232 (2d Cir. 2006) (quoting Regents of the Univ. of Cal. v. Doe, 519

U.S. 425, 429 (1997); citing McGinty v. New York, 251 F.3d 84, 95 (2d Cir. 2001)).  However,

Plaintiffs are seeking to invoke the doctrine of Ex Parte Young, 209 U.S. 123 (1908), which is a

limited exception to the general principle of sovereign immunity; this exception allows a suit

against individual state officials when the complaint alleges an ongoing violation of federal law and

seeks prospective injunctive relief to prohibit the violations.  See CSX Transp., Inc. v. N.Y. State

Office of Real Prop. Servs., 306 F.3d 87, 98 (2d Cir. 2002).  Plaintiff states that it seeks prospective

relief aimed at stopping State Defendants from barricading Abele's Crossing, which it asserts would

be a *de facto* taking without due process of law.  Plntf's Mem. of Law (Dkt. No. 45, Attach. 10) at

12.  Plaintiff's remedy seeks to prevent the State Defendants from implementing an order that would

allegedly amount to an unconstitutional taking; this remedy is a forward-looking action and,

accordingly, is exempted from the Eleventh Amendment bar to suit.  Therefore, pursuant to the Ex

Parte Young doctrine, this Court has jurisdiction over the State Defendants insofar as their actions

amount to an ongoing violation of federal law.

### ii.      Post-deprivation Process Does Not Satisfy Constitutional Due Process Requirement

State Defendants acknowledge that exhaustion is not a prerequisite to an action under

§ 1983, however, they argue that due process was not violated because New York affords plaintiffs

an adequate post-deprivation remedy for random and unauthorized deprivations.  State Defts' Reply

Mem. of Law (Dkt. No. 50, Attach. 10) at 2-3.  State Defendants assert that Plaintiff's allegation

that they failed to consider or follow the takings provision in section 97(5) means that the closure

order was a random and unauthorized act.  Therefore, according to State Defendants, Plaintiff did

not "exhaust" its state remedies and initiate a proceeding pursuant Article 78 of the New York Civil

Practice Law and Rules ("Article 78 Hearing") to seek review and compensation for the closure of

Abele's Crossing; State Defendants assert that this failure and the existence of the post-deprivation

proceeding means that Plaintiff's due process rights were not violated.  Id.

　　　　While the case law does support Defendants' position that plaintiffs are not necessarily

denied their due process rights when post-deprivation procedures exist, the timing and

circumstances surrounding the state's deprivation of constitutionally protected interests determines

what procedures satisfy due process requirements.  See Rivera-Powell, 470 F.3d at 465.  In Rivera-

Powell, the Second Circuit explained:

> When the state conduct in question is random and unauthorized, the state satisfies
> procedural due process requirements so long as it provides meaningful post-
> deprivation remedy. . . .  In contrast, when the deprivation is pursuant to an
> established state procedure, the state can predict when it will occur and is in the
> position to provide a pre-deprivation hearing.  Under those circumstances, the
> availability of post-deprivation procedures will not, *ipso facto*, satisfy due process.

Id. (internal citations and quotations omitted).  Accordingly, post-deprivation proceedings satisfy

due process requirements when the state cannot predict when a deprivation will occur and cannot

provide a pre-deprivation hearing - that was obviously not the case in the action at bar.  See id.

NYSDOT actually conducted a hearing before closing Abele's Crossing: State Defendants initiated

an administrative proceeding before Judge Nealon, who held four (4) days of public hearings and

issued a written decision recommending that the crossing be closed.  Accordingly, Plaintiff did

receive some process and the existence of a post-deprivation review of the closure order does not

automatically make the closing of Abele's Crossing consistent with due process.

　　　　Moreover, the Second Circuit has held that "the acts of high-ranking officials who are

11

'ultimate decision-maker[s]' and have 'final authority over significant matters,' even if those acts are contrary to law, should not be considered 'random and unauthorized' conduct for purposes of a procedural due process analysis." Id. at 465-66 (quoting Velez v. Levy, 401 F.3d 75, 91-92 & nn.14 & 15 (2d Cir. 2005)).  State Defendants explain that, as the Director of NYSDOT's Passenger and Freight Safety Division, Defendant Cottrell has been delegated the power to close railroad crossings and was properly authorized to sign the order closing Abele's Crossing.  Samaniuk Aff. (Dkt. No. 50, Attach. 7, Ex. F).  Therefore, even if State Defendants' failure to adhere to section 97(5) was contrary to law, the closure order cannot be considered a random and unauthorized act for purposes of due process analysis because it was undertaken by Defendant Cottrell, who did so as the ultimate decision maker.  As a consequence, under this line of case law, the closure order cannot automatically be considered consistent with due process because of the availability of a post-deprivation review process.  Therefore, the Court must determine if Plaintiff received adequate process before the closure order was issued.

### iii.    Plaintiff Afforded Process Required by Due Process Clause

Some type of hearing is required before an individual is finally deprived of a property interest; because Plaintiff had the opportunity for a pre-deprivation hearing, the Court must apply the test established in Mathews v. Eldridge, 424 U.S. 319 (1976), to determine whether the procedures afforded Plaintiff were sufficient to satisfy due process.  See Brody v. Vill. of Port Chester, 434 F.3d 121, 135 (2d Cir. 2005) (quoting Mathews, 424 U.S. at 335).  Mathews establishes the three-factor balancing test courts use to determine what process was due a plaintiff before a deprivation; the three factors are: (1) the private interest that will be affected by the official action, (2) the risk of an erroneous deprivation of such interest through the procedures used, and the

12

probable value of additional procedural safeguard, and (3) the Government's interest, including the function involved and the burden additional requirements would entail.  Id.

Plaintiff's interest in the action is obviously significant - its property interest in Abele's Crossing allows its heavy equipment to access its fields on the other side of the tracks; closing the crossing will mean that Plaintiff will either need to purchase additional equipment or use alternative crossings at potentially significant cost.  See Buono Aff. (Dkt. No. 45, Attach. 4) at ¶¶ 33, 36-40.  Moreover, the deprivation of a plaintiff's "interest in private property unquestionably weighs heavily in the due process balance."  Brody, 434 F.3d at 135 (citing United States v. James Danile Good Real Prop., 510 U.S. 43, 54-55 (1993)).  However, State Defendants initiated processes that afforded Plaintiff a pre-deprivation hearing.  NYSDOT commenced an administrative proceeding pursuant to section 97 of the Railroad Law, of which Plaintiff was notified.  See Buono Aff. (Dkt. No. 45, Attach. 4) at ¶ 28.  Plaintiff had an opportunity to testify before and make arguments to Judge Nealon.  See id. at ¶ 35.  Plaintiff acknowledges that Defendant Cottrell's closure order followed: "(1) a hearing that spanned almost four months, and (2) a written decision of an Administrative Law Judge.  From beginning to end, the process took over one year.  Over ten (10) [NYS]DOT employees attended the hearing, including [NYS]DOT counsel . . ."  Plntf's Reply Mem. of Law (Dkt. No. 55, Attach. 1) at 1.  Accordingly, State Defendants initiated and followed deliberative processes under section 97 of the Railroad Law that were unlikely to yield erroneous deprivations.

Additionally, State Defendants and New York have a strong interest in ensuring public safety.  The proceeding at issue was initiated pursuant to legislation granting NYSDOT's commissioner discretion to require alterations to rail crossings located in an intercity rail passenger

13

service corridor.  See N.Y. RAILROAD LAW § 97(3).  Moreover, the legislation requires the

Commissioner to conduct a hearing on the need for any alterations and other alternatives when the

railroad and property owners directly impacted by the crossing cannot reach an agreement regarding

such alterations.  Id.  The New York State's interests and the processes limiting its actions means

that due process did not require that State Defendants to afford Plaintiff additional procedural

protections: the interest in protecting passenger rail service is sufficiently important; while the

legislatively imposed limits prevent NYSDOT and State Defendants from unilaterally altering

crossings without hearings including all affected parties.

　　　Plaintiff's primary complaint appears to be that State Defendants did not act in conformity

with New York law.  However, State Defendants provided Island Park with an opportunity to be

heard "'at a meaningful time and in a meaningful manner'" - which is all due process requires.  See

Brody, 434 F.3d at 136 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965)).

### 2.　　Takings Claim

　　　In its Cross-Motion, Plaintiff appears to explain that the two-prong test for takings-type

claims announced in Williams County Reg'l Planning Comm'n v. Hamilton Bank, 473 U.S. 172

(1985), is not applicable in the instant matter because it only pleaded a due process claim, and not a

takings claim.  See Plntf's Mem. of Law (Dkt. No. 45, Attach. ) at 14.  Notwithstanding Plaintiff's

assertion, its Complaint also alleges that the closure of Abele's Crossing "would constitute a taking

of Island Park's interest without just compensation . . . in contravention of the United States

Constitution," Compl. (Dkt. No. 1) at ¶ 115, which Defendant seeks to dismiss as well.  See State

Defts' Mem. of Law (Dkt. No. 40, Attach. ) at 12-13.

　　　The Fifth Amendment's Takings Clause provides that "private property [shall not] be taken

14

for public use without just compensation," U.S. CONST. amend. V; this prohibition is applicable to states through the Fourteenth Amendment.  Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 160 (1980).  Plaintiffs seeking to establish a takings claim under § 1983 must show: (1) a property interest; (2) that has been taken under the color of state law; (3) without just compensation. Seventh Regiment Fund v. Pataki, 179 F. Supp. 2d 356, 361 (S.D.N.Y. 2002).  Plaintiff asserts that State Defendants have ordered the Railroad Defendants to barricade its easement across the tracks, namely Abele's Crossing, without compensating Plaintiff for the loss.  Plntf's Mem. of Law (Dkt. No. 45, Attach. 10) at 6.  Accordingly, Plaintiff has asserted a takings claim against State Defendants.

### i.    Regulatory Takings Ripeness Test

The ripeness test in Williamson County primarily applies to regulatory takings claims.  See Murphy v. New Milford Zoning Comm'n, 402 F.3d 342, 348-49 (2d Cir. 2005).  Plaintiff alleges that NYSDOT's order directing Railroad Defendants to barricade Abele's Crossing will prevent it from using its easement over the tracks.  While State Defendants' order does not require Plaintiff to suffer a physical invasion of its easement, it is a form of regulation that completely deprives Plaintiff of economically beneficial use of its property, which amounts to a regulatory taking.  See Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 538-39 (2005).  Therefore, the Williamson County ripeness test applies to any takings claim asserted by Plaintiff.

The Williamson County test provides that "takings-type claims are not ripe until (1) the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue, and (2) the claimant has sought compensation from the state if the state provides a reasonable, certain and adequate provision for

15

obtaining compensation." <u>Seventh Regiment</u>, 179 F. Supp. 2d at 362 (internal quotations omitted). In the instant case, it appears that Defendant Cottrell's closure order is a final decision for purposes of analyzing prong-one of the <u>Williamson County</u> test.  However, Plaintiff's takings claim is not ripe for review because Plaintiff failed to seek compensation from the New York State prior to commencing this action.

Numerous courts have found that New York State provides plaintiffs with reasonable procedures for obtaining compensation, which satisfy prong-two of the <u>Williamson County</u> test. See <u>Country View Estates @ Ridge, LLC v. Town of Brookhaven</u>, No. CV 04-4901 (BMC), 2006 U.S. Dist LEXIS 91981, at *37-*38 (E.D.N.Y. Aug. 15, 2006), <u>adopted</u> 452 F. Supp. 2d 142 (E.D.N.Y. 2006).  Additionally, the Second Circuit has held that Article 78 Hearings, a form of proceeding available to compel public officials to comply with their responsibilities, are constitutionally sufficient proceedings for seeking compensation in a takings claim; the Circuit has specifically dismissed takings claims on ripeness grounds where plaintiffs have failed to first seek compensation through Article 78 Hearings.  See <u>Vandor, Inc. v. Militello</u>, 301 F.3d 37, 38-39 (2d Cir. 2002).  Plaintiff commenced this action prior to initiating any action in the state courts seeking compensation - only doing so over three (3) months later on June 27, 2006, by an Article 78 Hearing in New York State Supreme Court, Albany County, alleging that the NYSDOT disregarded its property interests in Abele's Crossing and failed to follow procedures set forth in New York's eminent domain law.  State Defts' Stat. of Mat. Facts (Dkt. No. 40, Attach. 6) at ¶ 3.  Therefore, while Plaintiff has been afforded an adequate procedure to seek compensation, it has not completed the process and been denied such compensation.  Accordingly, Plaintiff's takings claim is not ripe, and because ripeness is jurisdictional, this Court does not have jurisdiction over the claim and

dismisses it.  See Vandor, Inc., 301 F.3d at 38.

Therefore, the Court grants Defendants' Motion for summary judgment on Plaintiff's second and third causes of action, denies Plaintiff's Motion for summary judgment on those causes of action, and dismisses them in their entirety.


### C.       Plaintiff's Preemption Claim

Plaintiff's first cause of action seeks injunctive relief enjoining State and Railroad Defendants from complying with the closure order because the Interstate Commerce Commission Termination Act of 1995, codified at 49 U.S.C. §§ 10101 et seq., ("ICCTA") preempts section 97 of the Railroad Law and, therefore, NYSDOT officials lack authority to close Abele's Crossing.  See Compl. (Dkt. No. 1) at ¶¶ 94-104.  Plaintiff asserts that the ICCTA expressly preempts state regulation of railroad facilities and property, which includes railroad crossings like the one at issue in the instant action.  See Plntf's Prelim. Injunction Mem. of Law (Dkt. No. 3, Attach. 2) at 4-6.  In the alternative, Plaintiff argues that the ICCTA's pervasive regulatory scheme demonstrates that Congress intended federal law to govern railroad regulation and impliedly preempts section 97.  See id. at 8.

Railroad Defendants respond that: (1) Plaintiff does not meet the "zone-of-interests test" and does not, as a result, have standing to assert that the ICCTA preempts the State Defendants' order; (2) railroad crossings are not expressly governed by the ICCTA, which, therefore, does not preempt the closure order; and (3) the purpose of the ICCTA does not implicate the closure of railroad crossings and cannot preempt section 97.  See CSXT Mem. of Law (Dkt. No. 38, Attach. 5) at 10-15.  In addition, State Defendants contend that the ICCTA does not preemption section 97 because

17

there is a strong presumption against federal preemption of a state law regulating public health, safety, and welfare - areas of traditional state concern.  State Defts' Mem. of Law (Dkt. No. 40, Attach. 7) at 7-11.

> **1.   Standing**

CSXT has invoked the prudential standing doctrine, also known as statutory standing, which is separate from Article III standing requirements.  When a case presents issues of both Article III and statutory standing, a district court must generally establish that it has constitutional jurisdiction, pursuant to Article III, before considering the merits of the case, including whether the plaintiff has statutory standing.  See Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co., 436 F.3d 82, 85-86 (2d Cir. 2006). In the instant case, Defendants have not challenged Plaintiff's Article III standing; moreover, Plaintiff has met the constitutional minimum of standing.  In order to satisfy Article III's "case" or "controversy" requirement, Plaintiff must demonstrate that it has suffered "injury in fact," that the injury is "fairly traceable" to Defendants' actions, and that the injury will likely be redressed by a favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  State Defendants' order directing Railroad Defendants to barricade Abele's Crossing is a tangible injury that directly prevents Plaintiff from accessing its easement to cross the tracks. Additionally, Plaintiff seeks an order from this Court enjoining Defendants from barricading the crossing - which, if granted, would completely remedy the complained-of injury by prohibiting Defendants from limiting Plaintiff's access to its easement.  Accordingly, Plaintiff has standing under Article III to pursue this case in federal court.

As established by the United States Supreme Court, the "zone-of-interests test" is designed to determine what interests are "arguably . . . to be protected" by the provision at issue and then

whether the plaintiff's interests are affected; the Court does not determine whether the plaintiff was specifically intended to benefit from the provision at issue.  See Nat'l Credit Union Admin v. First Nat'l Bank & Trust Co., 522 U.S. 479, 492 (1998).  In the instant case, Plaintiff invokes the ICCTA's preemptive force under the Supremacy Clause and not any rights that may or may not have been granted to it in the ICCTA.  See Plntf's Prelim. Injunction Mem. of Law (Dkt. No. 3, Attach. 2) at 3-6.  As a result, any "zone-of-interest" analysis of Plaintiff's statutory standing should not involve an analysis of the ICCTA, but instead of Plaintiff's interests protected by the Supremacy Clause.  See Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 73 (1st Cir. 2001), aff'd sub nom. Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 644 (2003) (court held that plaintiff had statutory standing to challenge state regulation as preempted by Medicaid because action asserted under the Supremacy Clause and not to enforce plaintiff's rights under Medicaid statute).

While in most contexts a party invoking a provision must assert interests that are arguably protected by that provision, a party does not need statutory standing to invoke the Supremacy Clause: a state law can be unenforceable as preempted by federal law even when the federal law does not provide the plaintiff with substantive rights for the party arguing preemption.  Id. (citing St. Thomas-St. John Hotel & Tourism Ass'n v. Virgin Islands, 218 F.3d 232, 241 (3d Cir. 2000); see also Planned Parenthood v. Sanchez, 403 F.3d 324, 331-33 (5th Cir. 2005) (explaining: (1) that Supreme Court affirmed Concannon without mention of any jurisdictional flaw and that seven Justices appear to have implicitly found no flaw and (2) that the Supreme Court has repeatedly entertained federal preemption claims seeking injunctive and declaratory relief, which also implicitly confirms plaintiffs' standing in preemption claims).  Accordingly, regardless of whether the ICCTA was designed to benefit Plaintiff, Plaintiff has standing to assert a preemption claim

19

predicated on the ICCTA against Defendants.

       **2.**       **Preemption**

       Plaintiff asserts that the ICCTA expressly preempts section 97.  Federal law preempts state

law when: "(1) the preemptive intent is explicitly stated in a federal statute's language or implicitly

contained in its structure and purpose; (2) state law actually conflicts with federal law; or (3) federal

law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left

no room for the States to supplement it."  <u>Green Mountain R.R. Corp. v. Vermont</u>, 404 F.3d 638,

642 (2d Cir. 2005) (internal quotations omitted).  Congressional intent, discerned from the language

of the preemption statute and the statute's structure, is the courts' polestar for preemption analysis.

<u>Id.</u>; <u>see also</u> <u>CSX Transp., Inc. v. Easterwood</u>, 507 U.S. 658, 664 (1993) ("If the statute contains an

express preemption clause, the task of statutory construction must in the first instance focus on the

plain wording of the clause, which necessarily contains the best evidence of Congress' preemptive

intent.").

       The issue is whether Abele's Crossing and State Defendants' closure order fall within the

Surface Transportation Board's exclusive jurisdiction as defined in the ICCTA.  Section 10501 of

the ICCTA is entitled General Jurisdiction, and states:

(b) The jurisdiction of the Board over -

(1) transportation by rail carriers, and the remedies provided in this part with respect to rates,
classifications, rules (including car service, interchange, and other operating rules), practices,
routes, services, and facilities of such carrier; and

(2) the construction, acquisition, operation, abandonment, or discontinuance of spur,
industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or
intended to be located, entirely in one State,

is exclusive.  Except as otherwise provided in this part, the remedies provided under this part

with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b).  Therefore, pursuant to the ICCTA, the Surface Transportation Board is vested with exclusive jurisdiction with respect to regulation of "transportation by rail carriers" and "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities . . ."  Id.  "Rail carriers" are persons providing common carrier railroad transportation.  42 U.S.C. § 10102(5).  The ICCTA defines "railroads" to include "a switch, spur track, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation."  42 U.S.C. § 10102(6)(C).  The ICCTA expansively defines "transportation" to include: "a locomotive, car, vehicle, vessel . . . yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use."  42 U.S.C. § 10102(9).

No party challenges that Railroad Defendants are "rail carriers" for purposes of the ICCTA and that the tracks are subject to federal regulation under the ICCTA.  Plaintiff asserts that the crossing is a "facility"or "property" related to the movement of passengers or property by rail, and is, therefore, subject to the Surface Transportation Board's exclusive jurisdiction.  See Plntf's Prelim. Injunction Mem. of Law (Dkt. No. 3, Attach. 2) at 9.  CSXT correctly notes that the ICCTA does not define "facility" or "facilities" specifically to include grade crossings.  See CSXT Mem. of Law (Dkt. No. 38, Attach. 5) at 11.  Additionally, the plain language of the ICCTA does not support Plaintiff's contention that crossings should be considered "facilities" under the act.  The dictionary defines "facility" to mean "something (as a hospital) that is built, installed, or established to serve a particular purpose."  MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 416 (10th ed. 1996).

Therefore, a facility is a structure designed to house specific operations, and not an improvement to the tracks that allows them to be crossed by traffic.  Moreover, as CSXT notes, the courts that have addressed the meaning of "facility" for purposes of the ICCTA consistently construe it to mean buildings or other structures that house equipment and systems related to railroad operation.  Id. at 12 (citing Green Mountain, 404 F.3d at 638 (analyzing "facility" with regards to the site for unloading salt and cement arriving by rail); High Tech Trans, LLC, v. New Jersey, 382 F.3d 295 (3d Cir. 2004) (related to regulation of bulk waste loading site); Coastal Distrib. LLC v. Town of Babylon, No. CV 05-2032 (JS) (ETB), 2005 U.S. Dist. LEXIS 40795 (E.D.N.Y. July 15, 2005) (regarding operation of transloading site used to transfer freight between trucks and railcars); Florida E. Ry. Co. v. City of W. Palm Beach, 110 F. Supp. 2d 1367 (S.D. Fla. 2000) (related to site for storing and distributing building materials)).  Accordingly, the language of the ICCTA and previous court decisions mean that Abele's Crossing is not a "facility" for purposes of the act.

However, a rail crossing does fit within the ICCTA's definition of "transportation" by rail carriers, which is under the exclusive jurisdiction of the Surface Transportation Board.  See 49 U.S.C. § 10501(b).  The ICCTA's definition of "transportation" is very broad and includes "property . . . of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use."  42 U.S.C. § 10102(9).  A rail crossing is, by definition, an improvement to railroad tracks that allows vehicles, equipment, and persons to traverse the tracks.  Any physical improvements made to railroad tracks - such as those made to construct a crossing - will necessarily impact and be involved in the movement of passengers and property passing over those tracks.  Therefore, the rail crossing is within the Surface Transportation Board's jurisdiction and State Defendants' order pursuant to section 97 of the New York Railroad

22

Law is expressly preempted by the ICCTA.

The language of the ICCTA clearly expresses Congress' legislative intention to preempt state regulation such as the closure order made under section 97, and the Court's preemption analysis could end there; however, the courts have also long recognized Congress's general intent to ensure the pervasive and comprehensive federal regulation of railroad operations, and the ICCTA's broad preemptive effect.  See, e.g., City of Auburn v. United States, 154 F.3d 1025, 1029-31 (9th Cir. 1998); CSX Transp. Inc. v. Georgia Pub. Serv. Comm'n, 944 F. Supp. 1573, 1581 (N.D. Ga. 1996) ("It is difficult to imagine a broader statement of Congress' intent to preempt state regulatory authority over railroad operations.").  Nevertheless, the Second Circuit has stated that "states and towns may exercise traditional police powers over the development of railroad property, at least to the extent that the regulations protect public health and safety, are settled and defined, can be obeyed with reasonable certainty, entail no extended or open-ended delays, and can be approved (or rejected) without the exercise of discretion on subjective questions."  Green Mountain, 404 F.3d at 643.  The Circuit listed electrical, plumbing and fire codes, and direct environmental regulations as examples of generally applicable, non-discriminatory regulations that would seem to withstand preemption.  Id.

In part, Section 97 states:

In order to insure public safety, the commissioner may, if he or she determines it appropriate, require alterations in an existing private rail crossing, including a farm crossing, which is located in an intercity rail passenger service corridor and is hereby authorized to participate in the cost of such alterations.  In the event that an agreement on such alterations cannot be reached between the railroad owning the crossing, property owners who are directly impacted by the crossing and the department, the commissioner shall conduct a hearing on the need for such alterations and whether any other alternatives are available, including the use of an alternate route or the closure of the crossing and shall, where applicable, determine the apportionment of responsibility for the alterations and maintenance of such crossing,

including any warning devices . . .

NEW YORK RAILROAD LAW § 97(3).  Section 97 gave NYSDOT's Commissioner the discretion to

determine if Abele's Crossing should be closed.  Moreover, because Plaintiff did not agree with the

Commissioner's decision, NYSDOT was obligated under section 97 to commence an administrative

hearing before an administrative law judge.  As a result, the processes undertaken pursuant to

section 97 entailed a lengthy review process, specifically targeted at the railroad crossing and not a

generally applicable regulation, and allowed state officials the discretion to determine the physical

form of the tracks: this is not the type of predictable, generally applicable regulation that the Circuit

envisioned withstanding the ICCTA's preemption clause.  See Green Mountain, 404 F.3d at 643

(permit process for construction of transloading facilities preempted by the ICCTA when it did not

set forth any schedule or regulation that the railroad could consult to assure compliance; and

issuance of permit awaited and depended on discretionary rulings of state or local agency).

Moreover, preemption of a state or local statute or ordinance invoking the police power to protect

the public safety related to train crossings is not inconsistent with prior court decisions.  See, e.g.,

Friberg v. Kansas City S. Ry. Co., 267 F.3d 439 (5th Cir. 2001) (state statute prohibiting a train

from blocking a grade crossing for more than five (5) minutes preempted by the ICCTA); Wisconsin

Cent. Ltd. v. City of Marshfield, 160 F. Supp. 2d 1009 (W.D. Wis. 2000) (state wished to remove

track in order to realign a highway to reduce traffic accidents; court found condemnation authority

preempted by the ICCTA).

  Having found that the ICCTA preempts the closing of Abele's Crossing under section 97,

the Court denies Defendants' Motions for summary judgment on Plaintiff's first cause of action.

Plaintiff has not sought summary judgment on its first cause of action and only seeks to stay its

remaining claims.  However, the Court may *sua sponte* enter summary judgment against the moving

party.  See Coach Leatherware Co. v. AnnTaylor, Inc., 933 F.2d 162, 167 (2d Cir. 1991).  The Court

may grant summary judgment without notice only when there is no indication that the moving party

might bring forward additional evidence and the facts were fully developed such that the moving

party suffers no procedural prejudice.  See Bridgeway Corp. v. Citibank, 201 F.3d 134, 139 (2d Cir.

2000).  Plaintiff and Defendants have fully briefed the preemption claim in their summary judgment

motions and the response to Plaintiff's Motion for a preliminary injunction.  Moreover, the

preemption question is a legal question that does not depend on any further factual development.

Defendants are not, therefore, prejudiced in any way by the Court's granting of summary judgment

on the preemption claim.  Moreover, it is in the interests of the parties to resolve this action

expeditiously and in the most efficient manner.  Accordingly, State Defendants are permanently

enjoined from employing section 97 of the New York Railroad Law to order the closure of Abele's

Crossing.  Railroad Defendants are enjoined from undertaking any actions to barricade Abele's

Crossing pursuant to the order issued by State Defendants under section 97.[1]


### D.   Remaining Claims

Plaintiff also sought to have the Court enforce the 1989 Order against Defendants.  CSXT

and Conrail in turn sought a declaratory judgment stating that they were not prohibited from

complying with State Defendants' closure order.  The Court has now enjoined Defendants from

enforcing the State Defendants' closure order.  As a result, Plaintiff's fourth cause of action and

---

[1] Although Plaintiff also claims that section 97 is preempted by the Federal Railroad Safety
Act ("FRSA"), codified at 49 U.S.C. §§ 20101 et seq., and the Commerce Clause, it is unnecessary
to decide this claim because of the Court's holding regarding the ICCTA.

CSXT and Conrail's counterclaim are now moot.

### III.    Conclusion

Based on the foregoing discussion, it is hereby

**ORDERED**, that CSXT's and Conrail's Motion for summary judgment (Dkt. No. 38) is **GRANTED IN PART** and **DENIED IN PART**; and it is further

**ORDERED**, that Amtrak's Motion for summary judgment (Dkt. No. 39) is **GRANTED IN PART** and **DENIED IN PART**; and it is further

**ORDERED**, that State Defendants' Motion for summary judgment (Dkt. No. 40) is **GRANTED IN PART** and **DENIED IN PART**; and it is further

**ORDERED**, that Plaintiff's Motion for summary judgment (Dkt. No. 45) is **DENIED**; and it is further

**ORDERED**, that Plaintiff's Second and Third Causes of Action against State Defendants, Compl. (Dkt. No. 1) at ¶¶ 105-118, are **DISMISSED**; and it is further

**ORDERED**, that Plaintiff's Fourth Cause of Action against all Defendants, Compl. (Dkt. No. 1) at ¶¶ 119-124, is **DISMISSED AS MOOT**; and it is further

**ORDERED**, that CSXT's and Conrail's Counterclaim for declaratory judgment (Dkt. No. 12) is **DISMISSED AS MOOT**; and it is further

**ORDERED**, that summary judgment is **GRANTED** for Plaintiff on its First Cause of Action against all Defendants, Compl. (Dkt. No. 1); and it is further

**ORDERED**, that State Defendants are **PERMANENTLY ENJOINED** from employing section 97 of the New York Railroad Law to order the closure of Abele's Crossing; and it is further

**ORDERED**, that Railroad Defendants are **PERMANENTLY ENJOINED** from undertaking any actions to barricade Abele's Crossing pursuant to the order issued by State Defendants under section 97; and it is further

**ORDERED**, that the Clerk serve a copy of this Order on the parties.

**IT IS SO ORDERED**.


DATED:      June 26, 2007
            Albany, New York



_____
                Lawrence E. Kahn
                U.S. District Judge